**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FORT BELKNAP HOUSING DEPARTMENT; FORT BELKNAP INDIAN COMMUNITY COUNCIL; FORT BELKNAP INDIAN COMMUNITY, *Petitioners*, <br><br> v. <br><br> OFFICE OF PUBLIC AND INDIAN HOUSING; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; UNITED STATES OF AMERICA, *Respondents*. | No. 12-70221 <br><br><br> OPINION |

On Petition for Review of an Order of the
Department of Housing and Urban Development

Argued and Submitted
March 7, 2013—Portland, Oregon

Filed August 8, 2013

Before: A. Wallace Tashima, Richard R. Clifton,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

## SUMMARY[*]

### Housing / Tribal Affairs

The panel dismissed a petition for review of a decision of the Department of Housing and Urban Development to withhold overpayments made to the Fort Belknap Housing Department under the federal rent-subsidy program for Indian Tribes and Tribal Designated Housing Entities.

The panel held that because the Department of Housing and Urban Development had taken no "action" pursuant to 25 U.S.C. § 4161(a), it lacked jurisdiction to entertain the appeal. The panel held it lacked jurisdiction because HUD neither alleged nor found that Fort Belknap failed to comply substantially with the provisions of the Native American Housing Assistance and Self Determination Act of 1996; and because HUD did not impose the remedies listed in 25 U.S.C. § 4161(a)(1). The panel dismissed Fort Belknap's petition without reaching the merits.

### COUNSEL

James L. Vogel (argued), Hardin, Montana, for Petitioners.

Stuart F. Delery (argued), Acting Assistant Attorney General, Michael S. Raab, and Jonathan H. Levy, Attorneys, Civil Division, United States Department of Justice, Washington, D.C., for Respondents.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

BEA, Circuit Judge:

Overview

This case involves a federal rent-subsidy program for Indian Tribes and Tribally Designated Housing Entities ("TDHE") that lease housing to Indians. The program provides per-unit payments while the Tribe or TDHE is leasing housing units to Indians, with a view that each unit eventually be conveyed to the Indian lessees. When the Tribe or TDHE conveys a unit, or a unit becomes eligible to be conveyed, unless such a conveyance is impractical, the Tribe should no longer receive rent subsidy money for the unit.

What happened here? The Fort Belknap Housing Department ("Fort Belknap"), a TDHE which received funds through the program, claimed and received rent subsidy payments for units that were no longer leased, but had been conveyed, and for units that were eligible to be conveyed. There were no circumstances which made the conveyance of such units impractical. After investigation, the Department of Housing and Urban Development ("HUD") demanded the return of the overpayments it had made.

Fort Belknap petitions this court for review of HUD's decision to withhold the amount of overpayments from future program payments. Fort Belknap argues this court has jurisdiction pursuant to 25 U.S.C. § 4161(d). On the merits, it claims HUD's actions in procuring repayment of the overpayments were "arbitrary and capricious" and based on a misinterpretation of various regulations. Section 4161(d), however, allows an appeal only when HUD takes action

pursuant to § 4161(a). Because HUD has taken no action pursuant to § 4161(a), we lack jurisdiction to entertain this appeal and dismiss Fort Belknap's petition without reaching the merits.

## I. Facts

### A. Statutory and Regulatory Framework

Fort Belknap operates as a TDHE in Harlem, Montana, for the Gros Ventre and Assiniboine Tribes of the Fort Belknap Indian Reservation. Fort Belknap is eligible to receive funds under the Native American Housing Assistance and Self Determination Act of 1996 ("NAHASDA" or "the Act"), 25 U.S.C. §§ 4101–4212. The Act created the Indian Housing Block Grant Program ("IHBG Program"), the current mechanism for disbursing funds to eligible beneficiaries. The Secretary of HUD[1] carries out NAHASDA's provisions, *see id.* § 4102, and allocates the funds Congress appropriates to implement the Act, *see id.* § 4152.

The IHBG Program utilizes a formula "to allocate equitably and fairly funds made available through NAHASDA among eligible Indian tribes." 24 C.F.R. § 1000.301, subpart D.[2] This formula consists of two parts:

---

[1] The Office of Public and Indian Housing ("PIH"), a division of HUD, oversees allocations under the IHBG Program. PIH will be referred to as "HUD" throughout this opinion.

[2] Congress appropriates a lump amount each year to be distributed among tribes/TDHEs. *See* 25 U.S.C. § 4151. Because the total amount of money available to all tribes is fixed, the IBHG Program is a zero-sum

"(a) Formula Current Assisted Housing Stock ('FCAS'); and (b) Need."  24 C.F.R. § 1000.310.  The FCAS component, which is at issue in this case, reflects the number of low-income housing units owned or operated by the Tribe/TDHE, multiplied by a fixed subsidy amount.  *See* 24 C.F.R. § 1000.316.  As relevant here, certain lease-to-own units (designated "Mutual Help" or "MH" units) are included in the FCAS calculation until (1) they have been conveyed by the Tribe/TDHE (i.e. transferred permanently to the lessees-turned-owners), or (2) they are eligible to be conveyed (i.e. have reached their Date of Full Availability" ("DOFA")), unless the Tribe/TDHE proves that, for reasons beyond its control, conveyance is impractical.  *See* 24 C.F.R. § 1000.318.

To ensure the accuracy of each year's FCAS calculation, HUD sends all eligible tribes/TDHEs a "Formula Response Form" and requires them to report any changes to their previously reported inventory of housing eligible for the IHBG Program.  *See* 24 C.F.R. § 1000.302 (defining "Formula Response Form"); *id.* § 1000.315(a) ("A recipient shall report changes to information related to the IHBG formula on the Formula Response Form, including corrections to the number of Formula Current Assisted Stock (FCAS), during the time period required by HUD.").  HUD uses the information gathered from these Formula Response Forms to calculate each tribe's/TDHE's grant allocation. *See* 24 C.F.R. §§ 1000.312, 1000.314.

---

game: Any change in one tribe's allocation requires an offsetting change to other tribes' allocations.

## B.  The 2001 Letter

On August 1, 2001, HUD sent Fort Belknap a letter ("the 2001 letter") and stated that Fort Belknap "may have incorrectly received credit in . . . 1998, 1999, 2000, and 2001 for 171 . . . [MH] units under the [FCAS] . . . component of the [IHBG] . . . formula."  In the letter, HUD notified Fort Belknap that it "believe[d] [these 171 MH] Projects ha[d] been conveyed or were eligible for conveyance prior to October 1, 1997."  The letter stated that, if Fort Belknap received funds for ineligible units,[3] HUD would recover those funds.  It also invited Fort Belknap to "provide information regarding the status of [the disputed] units to show that they should be counted as FCAS."

In response to the 2001 letter, Fort Belknap claimed several of the disputed units should remain in FCAS because they were occupied by "subsequent homebuyers" with new Mutual Help and Occupancy Agreements ("MHOA") and different DOFAs than HUD had on record.[4]  HUD later agreed that these "units should be counted as FCAS, provided that the term of the MHOA has not expired and that the Tribe/TDHE continue[s] to operate, maintain and collect payments from the homebuyer for the units."  HUD stated that it would "continue to include units with subsequent

---

[3] HUD challenged MH units in the following nine Projects: MT10B010001, MT10B010002, MT10B010003, MT10B010004, MT10B010006, MT10B010007, MT10B010008, MT91B010028, and MT91B010029.

[4] A "subsequent homebuyer" is one who occupies a unit after the initial homebuyer has vacated without obtaining ownership under his lease-to-own agreement.  Such an individual enters a new MHOA with the Tribe and, as such, has a different DOFA than that of the initial homebuyer.

homebuyers and/or DOFAs that continue to be within the 25-year term of the MHOA."

However, HUD excluded those units for which Fort Belknap offered no explanation from the FCAS calculations for fiscal years 1998, 1999, 2000, and 2001 and found that Fort Belknap had been overpaid by $330,524 during that period. By November 26, 2002, HUD and Fort Belknap had agreed that this amount would be repaid in roughly equal amounts over a five-year period.[5]

## C.  The 2005 Letter

On March 2, 2005, HUD sent Fort Belknap a letter ("the 2005 letter") very similar to the 2001 letter. Again, HUD challenged the eligibility for payment of designated units,[6] again relying on 24 C.F.R. § 1000.318(a). This time, however, HUD asked for specific information with respect to the disputed units. In particular, HUD asked Fort Belknap to provide "(1) [t]he date each unit became conveyance eligible[, and] (2) [t]he date each unit conveyed." It continued: "If units have not conveyed, please provide an explanation for the delay. If there are subsequent homebuyers, please provide a list of subsequent homebuyers, the date the new MHOA was signed and the term of the new MHOA." HUD asked Fort Belknap to provide this information within 30 days. When Fort Belknap failed to respond within the initial 30-day period, HUD sent a follow-up letter and warned that it would assume Fort Belknap

---

[5] Specifically, Fort Belknap agreed that HUD should deduct $66,104.80 from Fort Belknap's grant allocation for five years beginning in 2003.

[6] HUD challenged units in Project MT10B010010.

agreed it had been over-funded unless it received a response within a second 30-day period. When Fort Belknap again failed to respond, HUD sent a another letter, stated that it assumed Fort Belknap agreed with the substance of the 2005 letter, and subtracted $249,561 from Fort Belknap's 2006 allocation to recover the overpayment.

### D.  The 2007 Letter

On September 4, 2007, HUD sent Fort Belknap another letter ("the 2007 letter") which again challenged the eligibility of designated MH units based on 24 C.F.R. § 1000.318(a).[7]  HUD asked for specific information with respect to these units ("the first inquiry").  HUD also stated that it had reviewed its files associated with the 2001 letter and realized it lacked certain information.  In particular, for 93 of the MH units in 7 of the Projects[8] challenged in the 2001 letter, HUD requested (1) a list of subsequent homebuyers by unit number, (2) the date the new MHOA was signed, and (3) the term of the new MHOA ("the second inquiry").  HUD requested that Fort Belknap respond with respect to both inquiries within 30 days.  When Fort Belknap failed to do so, HUD sent a follow-up letter, warned Fort Belknap that a failure to respond to the first inquiry would be taken as an agreement it had been over-funded, and reiterated the substance of the second inquiry for Projects challenged in the 2001 letter.  Fort Belknap requested an extension, and

---

[7] HUD challenged MH units in the following three Projects: MT10B010011, MT10B010013, and MT10B0017.

[8] HUD requested information with respect to the following seven Projects:  MT10B010001,  MT10B010002,  MT10B010003, MT10B010004, MT10B010006, MT10B010007, MT10B010008.

when HUD granted Fort Belknap's request for an extension to respond to the first inquiry, it again repeated the substance of the second inquiry. Finally, when Fort Belknap failed to respond to the first inquiry before the deadline, HUD sent a fourth letter, stated its assumption that Fort Belknap agreed it had been overpaid in the amount of $310,330, proposed a repayment schedule, and repeated the substance of the second inquiry for a third time.

### E. Final HUD Resolution

On September 30, 2010, Fort Belknap sent HUD information about its FCAS inventory. Specifically, the letter identified units in various Projects which had been paid off or conveyed. In addition to the seven Projects from the 2001 letter for which HUD had requested information in the 2007 letter, Fort Belknap included information on Projects MT10B010010 (challenged as part of the 2005 letter), MT10B010013 (challenged as part of the 2007 letter), and several Projects for which there was no previous challenge. The letter listed the DOFAs and conveyance dates for units in these Projects. Some of the information contradicted Fort Belknap's responses to the 2001 letter. Fort Belknap acknowledged that the information might require changes to previous years' grant allocation amounts and "formally request[ed] the opportunity to discuss [any such] findings and, if collection of any sum is proposed, to negotiate that action."

After Fort Belknap satisfied HUD's requests for clarification, HUD wrote, in a letter sent on December 6, 2010 ("the 2010 letter"), that Fort Belknap had been overpaid $2,858,786 between 2000 and 2010. HUD explained that it would recover amounts associated with units challenged in

the 2001 letter for each fiscal year since 2000, units challenged in the 2005 letter for each fiscal year since 2003, units challenged in the 2007 letter for each fiscal year since 2006, and all other units for each fiscal year since 2009.

Fort Belknap filed an administrative appeal of HUD's decision addressed to HUD's Deputy Assistant Secretary for Native American Programs and argued that: (1) HUD's reductions exceeded the maximum reduction permitted by 24 C.F.R. § 1000.340(b),[9] and (2) HUD's action was not timely with respect to fiscal years 2000 through 2007, because it had not "taken action against" Fort Belknap within three years as required by 24 C.F.R. § 1000.319(d).[10]  HUD denied Fort Belknap's appeal because (1) when the correct amounts of Fort Belknap's grants were used, HUD's reductions were within the permissible range established by 24 C.F.R. § 1000.340(b), and (2) HUD took action for purposes of 24 C.F.R. § 1000.319(d) when it sent the 2001 letter, the 2005 letter, and the 2007 letter.  Fort Belknap sought reconsideration of this denial before the Deputy Assistant Secretary based on its disagreement regarding

---

[9] 24 C.F.R. § 1000.340(b) provides: "If an Indian tribe is allocated less funding under the formula than an IHA received on its behalf in FY 1996 for operating subsidy and modernization, its grant is increased to the amount received in FY 1996 for operating subsidy and modernization. The remaining grants are adjusted to keep the allocation within available appropriations." Fort Belknap argued that HUD's reductions exceeded the maximum amount permitted under this regulation.

[10] That regulation provides: "HUD shall have 3 years from the date a Formula Response Form is sent out to take action against any recipient that fails to correct or make appropriate changes on that Formula Response Form. Review of FCAS will be accomplished by HUD as a component of A–133 audits, routine monitoring, FCAS target monitoring, or other reviews."  24 C.F.R. § 1000.319(d).

whether the 2001 letter, the 2005 letter, and the 2007 letter constituted "taking action" under 24 C.F.R. § 1000.319(d). In a letter dated October 4, 2011 ("the final action letter"), the Assistant Secretary denied the request for reconsideration because:

> The correct interpretation of § 1000.319(d) is that if HUD fails to question an FCAS count within 3 years of the Formula Response Form at issue, HUD is precluded from seeking repayment for overpayments resulting from the counts reported in that Formula Response Form. In other words, the 3-year limitation applies to the time period before the first action HUD takes and does not limit the time that HUD can collect a repayment after the issuance of the Form so long as HUD begins the process within three years.

After HUD denied Fort Belknap's request to waive the repayment requirement or alter the repayment schedule, Fort Belknap filed a petition for review with this court. It argues that this court has jurisdiction to review HUD's actions pursuant to 25 U.S.C. § 4161(d) and that HUD's actions were "arbitrary and capricious" and/or based on a misinterpretation of 24 C.F.R. §§ 1000.318, 1000.319.

## II. Analysis

Before this court may reach the merits of Fort Belknap's petition, it must determine whether it has jurisdiction. *See, e.g.*, *In re Corrinet*, 645 F.3d 1141, 1143 (9th Cir. 2011) ("As we must, we first consider whether we have jurisdiction to hear [the] appeal."). Fort Belknap argues that the court has

jurisdiction pursuant to 25 U.S.C. § 4161(d).  This statute provides that "[a]ny recipient who receives notice under subsection (a) . . . of the termination, reduction, or limitation of payments under this chapter" may file a petition for review of the Secretary's action "with the United States Court of Appeals for the circuit in which such State is located, or in the United States Court of Appeals for the District of Columbia."  25 U.S.C. § 4161(d)(1)(A).  As relevant here, subsection (a) provides:

> [I]f the Secretary finds after reasonable notice and opportunity for hearing that a recipient of assistance under this chapter has failed to comply substantially with any provision of this chapter, the Secretary shall—
>
> > (A) terminate payments under this chapter to the recipient;
> >
> > (B) reduce payments under this chapter to the recipient by an amount equal to the amount of such payments that were not expended in accordance with this chapter;
> >
> > (C) limit the availability of payments under this chapter to programs, projects, or activities not affected by such failure to comply; or
> >
> > (D) in the case of noncompliance described in section 4162(b) of this title, provide a replacement tribally designated housing entity for the recipient, under section 4162 of this title.

25 U.S.C. § 4161(a)(1).  In short, then, we have jurisdiction only where HUD (1) determines, after reasonable notice and an opportunity for hearing, that a recipient has failed to comply substantially with NAHASDA's provisions, and (2) imposes one of the four statutorily required sanctions for such failure.  *See id.*  As explained below, neither condition is met here.  Accordingly, we lack jurisdiction over Fort Belknap's petition and dismiss it without reaching the merits.

A.  This court lacks jurisdiction because HUD neither alleged nor found that Fort Belknap failed to comply substantially with the provisions of NAHASDA.

This court has jurisdiction under § 4161(d) only where HUD finds "after reasonable notice and opportunity for hearing that a recipient of assistance . . . has failed to comply substantially" with some provision of NAHASDA. 25 U.S.C. § 4161(a)(1).  Here, neither the final action letter nor any letter which preceded it *alleged* that Fort Belknap had failed to comply substantially with NAHASDA.  In other words, HUD never provided "reasonable notice" of such a finding, as would be required under § 4161(a)(1).  Similarly, HUD never *found* Fort Belknap to be in substantial noncompliance with NAHASDA's provisions.  Instead, it determined that Fort Belknap was overpaid because of its inaccurate FCAS counts and sought to recover those amounts.  Though HUD determined that Fort Belknap failed to comply with NAHASDA by misreporting its FCAS counts, such misreporting is specifically excluded from the statutory definition of "substantial noncompliance" and cannot be the basis of jurisdiction in this court.  *Id.* § 4161(a)(2) (providing that "[s]ubstantial noncompliance" excludes "the failure of a recipient to comply with the requirements . . . regarding the reporting of low-income dwelling units . . . in itself").

HUD possesses the authority to recover the amounts of overpayment Fort Belknap received independent of its power to find substantial noncompliance under § 4161. *See United States v. Mead*, 426 F.2d 118, 125 (9th Cir. 1970). In *Mead*, this court held that, pursuant to the common law doctrine of payment by mistake, the Government is entitled to recover payments when it made those payments "under an erroneous belief which was material to the decision to pay." *Id.* There, via the Agricultural Conservation Program, the Government "assist[ed] farmers . . . in carrying out approved conservation practices" by "pay[ing] to or for each farmer the lesser of a fixed percentage of the cost price of dirt ditches or dams or a fixed price per unit of work performed." *Id.* at 120. Under the applicable regulations, contractors were to submit invoices with prices "based on [the] actual cost to the farmer measured in terms of cash, enforceable promises, materials and services rendered rather than the 'true value' of the completed project." *Id.* at 124. But, in *Mead*, the contractor had submitted invoices with "prices" which represented the projects' true value, rather than their cost, and no farmer had paid an amount equal to "the fixed percentage of the claimed cost of the project which the farmer was to bear." *See id.* at 120. The Government asserted that it had paid the contractor based on the mistaken assumption "that it was sharing the cost of the conservation projects with the farmers rather than paying the entire cost (or substantially the entire cost)." *Id.* The district court rejected this theory of recovery. *Id.* at 121.

This court reversed and held that "the government was mistaken in its payments to the extent that the payments exceeded the established percentage of the cost of each project; cost being measured by the value given by each farmer in cash, enforceable promises, services, equipment and materials." *Id.* at 124. Because the Government's mistake

"was material to the decision to pay, it [was] entitled to recover the payments." *Id.* On that basis, this court reversed and remanded so that the district court could "make findings on the issues of number and amount of payments made by mistake." *Id.*

Like the Government in *Mead*, HUD can recover the amount of over payment to Fort Belknap pursuant to the doctrine of payment by mistake. It was not required to resort to § 4161 to recover those amounts, and it did not do so. HUD found that Fort Belknap had been overpaid because of HUD's mistaken belief, based on the Formula Response Forms Fort Belknap submitted, that various MH units had not been conveyed and were not eligible to be conveyed but were instead still leased out, and therefore eligible for the HUD subsidy. HUD sought merely to recover the amounts it paid by mistake. Because HUD never found Fort Belknap to be in substantial noncompliance, § 4161 does not confer jurisdiction on this court.

B.  This court lacks jurisdiction because HUD did not impose the remedies listed in § 4161(a)(1).

This court has jurisdiction under § 4161(d) only if HUD (1) terminated payments to Fort Belknap, (2) reduced payments to Fort Belknap "by an amount equal to the amount of such payments that were not expended in accordance with this chapter," (3) limited the availability of payments "to programs, projects, or activities not affected by such failure to comply," or (4) provided a replacement tribally designated housing entity. *See* 25 U.S.C. § 4161(a)(1)(A)–(D). Fort Belknap argues that, in a letter dated November 14, 2011, HUD "clearly anticipates that the monies for which their demand has been made have been expended for units not

otherwise eligible. . . . If the monies were still in hand, HUD could have simply requested their return." Thus, Fort Belknap argues that this court has jurisdiction because HUD imposed a remedy under § 4161(a)(1)(B) and reduced payments "by an amount equal to the amount of such payments that were not expended in accordance with this chapter." This argument is without merit.

HUD's proposed repayment schedule was not a determination that the disputed funds "were not expended in accordance" with NAHASDA. In the 2010 letter, HUD asked Fort Belknap to contact its staff "to discuss repayment options for the over-funding received in FYs 2000 through 2010." It continued:

> Staff will work with your Tribe to find a suitable way to structure repayment. This may involve reducing previous and/or future year's funding. Should you have funds that are not obligated, it may be beneficial to you to reduce previous years' grants to enable compliance with the 2-year obligation performance measure.

HUD repeated this invitation to discuss repayment options when it denied Fort Belknap's administrative appeal. HUD's November 14, 2011 letter stated that HUD would "extend the time for the Tribe to establish a repayment plan . . . . If a repayment plan is not established in this timeframe, HUD will deduct the funding for ineligible units over a five-year period beginning in FY 2012 through FY 2016." Thus, the proposed repayment plan should be read as the option most convenient to HUD's collection efforts; it had nothing to do with HUD's

beliefs as to whether and how the funds in question had been expended by Fort Belknap.

HUD never alleged nor found that any funds "were not *expended* in accordance with this chapter."   25 U.S.C. § 4161(a)(1)(B) (emphasis added).  Instead, it found that Fort Belknap "incorrectly received funding" for ineligible units. Because HUD's remedy (i.e. the repayment of funds received in error) was not among those remedies listed in 25 U.S.C. § 4161(a)(1), this court lacks jurisdiction.[11]

### III.  Conclusion

For these reasons, Fort Belknap's petition for review is

**DISMISSED.**

---

[11] At oral argument, HUD's counsel suggested that Fort Belknap could raise its claims in the appropriate district court.  We do not decide whether any other court has jurisdiction, as that issue is not before us, but we note that our holding does not necessarily mean Fort Belknap is without judicial recourse.