**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CROW TRIBAL HOUSING AUTHORITY, *Plaintiff-Appellee*, | No. 13-35284 |
| | D.C. No. 1:06-cv-00051-RFC |
| v. | |
| U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *Defendant-Appellant*. | OPINION |

Appeal from the United States District Court
for the District of Montana
Richard F. Cebull, Senior District Judge, Presiding

Argued and Submitted
October 9, 2014—Portland, Oregon

Filed March 26, 2015

Before: Raymond C. Fisher, Morgan Christen,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Christen

SUMMARY[*]

**Tribal Matters / Housing**

The panel vacated the district court's order remanding the case to the Department of Housing and Urban Development ("HUD") for a hearing, reversed the judgment, and remanded for judgment to be entered in favor of HUD in a case brought by the Crow Tribal Housing Authority, arising from a dispute involving Indian housing block grants made under the Native American Housing Assistance and Self-Determination Act of 1996.

The panel held that the district court erred in ruling that HUD violated Crow Housing's right to Native American Housing Assistance and Self-Determination Act of 1996's notice and reporting requirements under 25 U.S.C. §§ 4161 and 4165.

Specifically, the panel concluded that HUD did not act under § 4161, and accordingly, could not have violated a hearing requirement under that section. The panel further concluded that HUD's actions triggered the opportunity for a hearing under § 4165 when it conducted an on-site review of Crow Housing in August 2004. Finally, the panel held that because Crow Housing did not request a hearing, HUD did not violate its statutory obligation under § 4165 and did not improperly deprive Crow Housing of a hearing under the facts of the case.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Jonathan H. Levy (argued) and Michael S. Raab, Attorneys, Appellate Staff; Stuart F. Delery, Assistant Attorney General; Michael W. Cotter, United States Attorney, Civil Division, Department of Justice, Washington, D.C.; and Victoria L. Francis, Assistant United States Attorney, Office of the United States Attorney, Billings, Montana, for Defendant-Appellant.

Dennis M. Bear Don't Walk (argued) and Roger J. Renville, Office of Legal Counsel, Crow Nation Executive Branch, Crow Agency, Montana, for Plaintiff-Appellee.

**OPINION**

CHRISTEN, Circuit Judge:

This case arises from a dispute involving Indian housing block grants made under the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), 25 U.S.C. §§ 4101–4243. Since 1998, Crow Tribal Housing Authority ("Crow Housing" or "the Tribe"),[1] located in Montana, has received NAHASDA grant payments from the Department of Housing and Urban Development ("HUD"). In 2001, HUD realized that it had overpaid Crow Housing and sought to recover the overage through deductions from future grants. HUD did not provide Crow Housing with a hearing at which these deductions could be contested, and this appeal concerns whether that was

---

[1] Crow Housing also refers to itself as the Apsaalooke Nation Housing Authority.

improper. The district court held that HUD acted under 25 U.S.C. § 4161 and § 4165, and that it violated the Tribe's right to notice and a hearing. This appeal followed.

Because the record establishes that HUD's actions triggered 25 U.S.C. § 4165 but did not violate that section's hearing requirement, we reverse the district court's judgment.

## BACKGROUND

### I. Statutory and Regulatory Framework

NAHASDA was enacted primarily to "provid[e] affordable homes in safe and healthy environments" for members of Indian tribes, in a way that "recognizes the right of Indian self-determination and tribal self-governance." 25 U.S.C. §§ 4101(5), (7). It replaced several disparate housing assistance programs with the Indian Housing Block Grant Program. The Act authorizes HUD to allocate grants among recipient tribes. *Id.* § 4152(a)(1). Because all tribes receive grants from the same finite pool of funds, *see* 25 U.S.C. § 4151, overpayments to one tribe directly reduce the funds available for other tribes.

HUD uses an allocation formula that considers a tribe's Formula Current Assisted Stock (FCAS) and need. 24 C.F.R. § 1000.310. The FCAS is the product of multiplying a fixed subsidy by the number of low-income housing units a tribe owns or operates. *Id.* § 1000.316. FCAS accounts for certain lease-to-own housing units until a tribe "no longer has the legal right to own, operate, or maintain the unit[s], whether such right is lost by conveyance, demolition, or otherwise." *Id.* § 1000.318(a). To ensure FCAS accuracy, HUD requires recipient tribes to update the status of their housing units in

an annual Formula Response Form, and to remove units no longer eligible for inclusion in the formula. *Id*. §§ 1000.315, 1000.319. Because HUD uses these updates to calculate annual grants, removal of units directly reduces a tribe's annual grant amount. *See id.* §§ 1000.312, 1000.314.

If a tribe fails to comply with NAHASDA, the Act provides for certain remedies. 25 U.S.C. § 4161. Subsection 4161(a) requires HUD to offer "reasonable notice and opportunity for hearing" before finding that a tribe "has failed to comply substantially" and before imposing those remedies. Remedial action is mandatory upon a finding of substantial noncompliance under this section. *Id.* § 4161(a)(1).

Under 25 U.S.C. § 4165, HUD may also adjust a tribe's grant amount after an audit or review, but adjustments imposed pursuant to § 4165 are not mandatory.

## II. Factual Background and Administrative Proceedings

### a. 2001 Inspector General Audit

In August 2001, HUD's Office of the Inspector General ("OIG") issued a report indicating that it had "performed a nationwide audit to evaluate [NAHASDA] program implementation."[2] During the audit, OIG "performed on-site visits at 17 Housing Entities within four of the six Office of Native American Programs (ONAP) regions." Though the audit was described as "nationwide," the map of the entities

---

[2] OIG is responsible for auditing and evaluating all of HUD's operations. The Office of Native American Programs ("ONAP") is the HUD entity responsible for administering NAHASDA programs. OIG's report and recommendations were directed to ONAP.

visited shows that OIG performed no on-site visits in the Northern Plains region, which covers Montana and Crow Housing. OIG's "objective was not to audit the tribes but to assess NAHASDA program performance as a whole." During the on-site visits, OIG "tested the accuracy of HUD's FCAS data to determine if the Housing Entities received correct funding." OIG discovered FCAS inaccuracies, and determined that HUD had "over funded some Housing Entities and under funded others." The report references recommendations OIG made to ONAP in May 2001, when it suggested that the office "[a]udit the [FCAS] for all Housing Entities," "[r]ecover over funding," and "reallocate the recovery to recipients that were under funded."

ONAP responded to the recommendations within 60 days:

> The ONAP has taken several actions to ensure that tribes are reporting accurate information on Formula Current Assisted Stock (FCAS). . . . This includes guidances to both tribes and Area ONAP staff, the annual Formula Response Form and a letter to tribal leaders. We have incorporated the monitoring of FCAS in our on-site monitoring. However, resources are not adequate to provide on-site monitoring to each grantee.

### b. HUD's Correspondence with Crow Housing

The record contains no evidence that HUD performed on-site monitoring of Crow Housing in 2001, or at any point before 2004. But by some means, in 2001 HUD discovered that from 1998 through 2001, it had overpaid Crow Housing for lease-to-own units that were no longer eligible for FCAS

consideration.  In a September 2001 letter, HUD informed Crow Housing it had been overpaid because several units had "been conveyed or were eligible for conveyance."  The letter gave notice to Crow Housing that HUD planned to recover the overpayments, and that the Tribe should contact HUD "within 30 days of the date of th[e] letter" if it disagreed.

Crow Housing did not respond.  In January 2002, HUD sent a second letter indicating it had not heard from the Tribe, and that it was writing "to confirm . . . agreement with [HUD's] information and to determine a repayment plan to recover any over-allocated funds."  Because it needed to finalize the matter, HUD informed Crow Housing that if it did not respond within 30 days, HUD would assume it acceded to repayment.

Crow Housing's silence persisted.  In June 2002, HUD sent a third letter enclosing copies of its two previous letters and stating that the agency had updated the calculations and determined the overpayment amount.  HUD also set forth a schedule to recoup that amount through adjustments to Crow Housing's grants over the course of five subsequent fiscal years.

More than a year passed.  In November 2003, Crow Housing provided its first response on the issue.  It requested copies of the first two HUD letters and indicated it would "make the substantive argument against HUD's position" upon receipt of those letters.  HUD supplied copies of its earlier letters and informed Crow Housing that although it had made deductions to the Tribe's 2002 and 2003 allocations, the agency failed to remove the ineligible units from its subsequent calculations, resulting in continued overpayments.  HUD added the additional overpayments to

the balance—resulting in a total of $1,244,837—and invited Crow Housing to establish a new repayment plan within 30 days.

### c. On-Site Review and Administrative Appeal

Crow Housing met with HUD in April 2004 and asked the agency to suspend the repayment schedule until HUD performed an on-site review. HUD agreed. In August 2004 it conducted a three-day "on-site monitoring review" of the Tribe's FCAS, and determined a new outstanding balance of $1,300,043 for Crow Housing's overpayments. In October 2005, HUD informed Crow Housing of its decision and of the Tribe's right to appeal. Crow Housing asked HUD to reconsider, claiming that the agency "unlawfully [sought] to terminate, reduce and/or limit [the Tribe's] federal funding." Crow Housing did not argue that HUD deprived it of a hearing, nor did it request one.

HUD denied Crow Housing's request for reconsideration.

## III.    District Court Proceedings

Crow Housing filed a complaint in the District of Montana, alleging that HUD violated NAHASDA by finding the Tribe to be in "substantial noncompliance" with the Act's provisions without offering an opportunity for hearing. Both parties agreed there had been no hearing, and in February 2013 the district court ruled on the parties' cross-motions for summary judgment.

First, the district court granted partial summary judgment to HUD, holding that the agency acted within its statutory authority when it adjusted Crow Housing's FCAS account.

The court concluded HUD properly reduced the number of FCAS-eligible units under 24 C.F.R. § 1000.318.[3]  Crow Housing has not appealed that decision.

Second, the district court granted partial summary judgment to Crow Housing, ruling that HUD acted under 25 U.S.C. § 4161 and § 4165 when it sought to recover the overpayments.  The district court concluded that HUD's action was arbitrary and capricious because "it violated [Crow Housing's] right to NAHASDA's Notice and Hearing requirements for substantial noncompliance."  Notably, the district court held that HUD violated the notice and hearing requirements under both 25 U.S.C. § 4161(a) and § 4165 and remanded the matter to HUD for a hearing.[4]

HUD timely appealed the second portion of the district court's summary judgment ruling.  HUD argues that it may recover overpayments without a formal hearing if it does not rely on a finding of "substantial noncompliance" under § 4161, and further argues that it did not act under 25 U.S.C. § 4161 *or* § 4165 because it exercised its "common law authority" to recover payments made by mistake.  In the alternative, HUD asserts that even if it did act under § 4165, Crow Housing was not entitled to a hearing.

HUD's recovery of the overpayments it made to Crow Housing is on hold, pending the outcome of this litigation.

---

[3] As discussed, 24 C.F.R. § 1000.318 defines when units no longer qualify for FCAS consideration.

[4] Section 4165's hearing requirement appears in its interpreting regulation, 24 C.F.R. § 1000.532(b) (2012).

## STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291, and review de novo a district court's ruling on summary judgment. *CRM Collateral II, Inc. v. TriCounty Metro. Transp. Dist. of Or.*, 669 F.3d 963, 968 (9th Cir. 2012). "We view the evidence in the light most favorable to the nonmoving party and determine 'whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.'" *Id.* (quoting *Trunk v. City of San Diego*, 629 F.3d 1099, 1105 (9th Cir. 2011)).

We may set aside an agency action "only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)). The standard of review is "'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists.'" *Id.* (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)).

## DISCUSSION

This appeal poses a single question: was Crow Housing entitled to a hearing before HUD took action to recover its overpayments of NAHASDA funds? The answer to this question depends on the authority HUD invoked when it sought to recover the overpayments. HUD's letters cited 24 C.F.R. § 1000.318(a)(1) and (a)(2) for the authority to adjust FCAS counts, but they did not indicate the source of HUD's authority to recover the overpayments. The district court concluded that HUD invoked its authority under § 4161 *and*

§ 4165, and that it violated notice and hearing requirements under both sections.  The two sections are the only ones cited by the parties in the district court and on appeal, and we know of no other hearing provisions relevant to this case.  We assess the applicability of each section in turn.

## I.   HUD Did Not Act Under § 4161.

On appeal, Crow Housing relies on the district court's determination that HUD acted under § 4161.  When HUD acts under that section, a grantee tribe is plainly entitled to a hearing.   Subsection 4161(a)(1) requires that HUD take action if, after notice and an opportunity to be heard, it makes a finding that a grant recipient is in "substantial noncompliance":

> *[I]f* the Secretary finds *after reasonable notice and opportunity for hearing* that a recipient of assistance under this chapter *has failed to comply substantially* with any provision of this chapter, the Secretary *shall*—
>
> (A) terminate payments under this chapter to the recipient;
> (B) reduce payments under this chapter to the recipient by an amount equal to the amount of such payments that were not expended in accordance with this chapter;
> (C) limit the availability of payments under this chapter to programs, projects, or activities not affected by such failure to comply; or
> (D) in the case of noncompliance described in section 4162(b) of this title, provide a

replacement tribally designated housing entity for the recipient, under section 4162 of this title.

(Emphasis added).

In 2008, Congress added another subsection to § 4161(a): "The failure of a recipient to comply with the requirements of section 4152(b)(1) of this title regarding the reporting of low-income dwelling units *shall not, in itself, be considered to be substantial noncompliance* for purposes of this subchapter." *Id*. § 4161(a)(2) (emphasis added). The Senate Report makes clear that the 2008 amendment was a clarification, not a substantive change to the statute:

> *Clarification* on Availability of Administrative Hearing (Amends Section 401(a) of current law): Under this amendment, if a grant recipient is required to relinquish overpaid funds due to the inclusion of housing units deemed ineligible under Section 301, *the action does not constitute substantial non-compliance by the grantee and does not automatically trigger a formal administrative hearing process.* The amendment has been included due to the significant amount of time and resources involved in a hearing, which may not be necessary when a grant recipient is otherwise in compliance with the requirements of the Act.

S. Rep. No. 110-238, at 10 (2007) (emphasis added). "We have long recognized that clarifying legislation is not subject

to any presumption against retroactivity and is applied to all cases pending as of the date of its enactment." *ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 689 (9th Cir. 2000). We "honor Congress'[s] clarification label" and accept § 4161(a)(2) "as a statement of what the statute has meant all along." *Id.* at 690 (alterations omitted) (quoting *Beverly Cmty. Hosp. Ass'n v. Belshe*, 132 F.3d 1259, 1266 (9th Cir. 1997)) (internal quotation marks omitted). We therefore apply § 4161(a)(2) to HUD's actions in this case, and analyze § 4161 with the understanding that failure to update FCAS counts "shall not, in itself, be considered to be substantial noncompliance."

The record contains no evidence that HUD found Crow Housing to be in "substantial noncompliance." *See Fort Belknap Hous. Dep't v. Office of Pub. & Indian Hous.*, 726 F.3d 1099, 1104–05 (9th Cir. 2013) (holding HUD did not act under § 4161 where there was no evidence HUD found substantial noncompliance). Instead, the agency's correspondence to Crow Housing repeatedly indicated that the overpayments were the result of errors, without attributing those errors to the Tribe. In correspondence dated September 2001, January 2002, and June 2002, HUD stated that the Tribe "may have incorrectly received funding" for "units under the Formula Current Assisted Stock (FCAS) component of the Indian Housing Block Grant (IHBG) formula." Even after its 2004 on-site review, HUD continued to indicate that the Tribe "incorrectly received credit," without attributing fault. HUD's letters did not state that the Tribe had failed to "substantially comply" with NAHASDA. In fact, HUD's February 2004 letter asserted that the agency itself was partly at fault for the continuation of the overpayments after a repayment schedule had been put in place: "[W]e discovered that there was an error made in data

entry and, as a result, the units were not removed from the FY 2002 and 2003 allocations."

All of HUD's letters cited 24 C.F.R. § 1000.318, but that regulation merely defines when units no longer qualify as FCAS; none of HUD's letters mention § 4161 or "substantial noncompliance" with NAHASDA and none of them seek to impose the remedies and sanctions listed in § 4161. The record contains no evidence that HUD tried to terminate payments, reduce payments in an amount equal to payments not properly expended,[5] limit the availability of payments for other programs or projects, or provide a replacement housing entity. *See* 25 U.S.C. § 4161; *Fort Belknap*, 726 F.3d at 1105–06 (holding HUD's administrative offset does not constitute a § 4161(a)(1) remedy). HUD only attempted to recover the overpayments through a reduction to future grant distributions—a remedy consistent with § 4165.

We conclude that HUD did not act under § 4161, and, accordingly, could not have violated a hearing requirement under that section. We therefore turn to whether HUD's actions fell under its § 4165 authority.

## II.      HUD's Actions Were Consistent With § 4165.

HUD disputes that it acted under § 4165, but the record in this case compels the conclusion that HUD's actions triggered the opportunity for a hearing under this statutory provision.

---

[5] HUD claimed only that the Tribe "incorrectly received credit," and made no determination on whether any NAHASDA funds had been improperly expended.

Subsections 4165(b) and (d) permit HUD to adjust a tribe's grant amount after conducting a review or audit:

> (b) Additional reviews and audits
>
> > (1) In general
> >
> > In addition to any audit or review under subsection (a) of this section, to the extent the Secretary determines such action to be appropriate, the Secretary may conduct an audit or review of a recipient in order to—
> >
> > (A) determine whether the recipient—
> >
> > > (i) has carried out—
> > >
> > > > (I) eligible activities in a timely manner; and
> > > >
> > > > (II) eligible activities and certification in accordance with this chapter and other applicable law;
> > >
> > > (ii) has a continuing capacity to carry out eligible activities in a timely manner; and
> > >
> > > (iii) is in compliance with the Indian housing plan of the recipient; and
> >
> > (B) verify the accuracy of information contained in any performance report

submitted by the recipient under section 4164 of this title.

(2) On-site visits

To the extent practicable, the reviews and audits conducted under this subsection shall include on-site visits by the appropriate official of the Department of Housing and Urban Development.

. . . .

(d) Effect of reviews

Subject to section 4161(a) of this title, after reviewing the reports and audits relating to a recipient that are submitted to the Secretary under this section, the Secretary may adjust the amount of a grant made to a recipient under this chapter in accordance with the findings of the Secretary with respect to those reports and audits.

HUD's 2004 on-site review of Crow Housing qualified as a review of "whether the recipient . . . has carried out . . . eligible activities and *certification in accordance with this chapter* and other applicable law." *See* 25 U.S.C. § 4165(b)(1)(A)(i)(II) (emphasis added). Under 24 C.F.R. § 1000.315(a), tribes are required to use the Formula Response Form to make "corrections to the number of Formula Current Assisted Stock . . . not less than 60 days from" when HUD mails the form each year. NAHASDA does not define "eligible activities and certification," and it is

ambiguous whether the term encompasses the reporting contemplated in § 1000.315(a). But "'[s]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *Cnty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992) (alteration omitted) (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985)).[6] Construing this statutory provision to Crow Housing's benefit, we conclude HUD's 2004 on-site FCAS review constituted an audit within the meaning of § 4165 to determine whether the Tribe had carried out "eligible activities and certification in accordance with this chapter and other applicable law." HUD therefore acted consistently with its authority under § 4165.

We do not need to decide whether the letters HUD issued in the wake of the OIG review triggered § 4165 because in this case, the Tribe specifically requested an on-site review,

---

[6] We have previously held that this canon of statutory interpretation, also referred to as the *Blackfeet* presumption, gives way under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), to the deference courts normally afford to an agency's interpretation of a statute it administers. *See Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 730 (9th Cir. 2003); *Haynes v. United States*, 891 F.2d 235, 239 (9th Cir. 1989). However, where the agency's interpretation is not the result of its formal resolution of the question and is merely a litigating position, as here, *Chevron* deference does not apply. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212–13 (1988); *United States v. Able Time, Inc.*, 545 F.3d 824, 836 (9th Cir. 2008). Our interpretation is therefore guided by the *Blackfeet* presumption and not by *Chevron* deference. Even if HUD's interpretation of its actions was entitled to some deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), its "power to persuade" would be minimal due to the lack of any formal or thorough interpretive process. *See United States v. Mead Corp.*, 533 U.S. 218, 227–31, 235 (2001).

and HUD agreed to conduct one. Further, the record shows that the "on-site monitoring of the Tribe's [FCAS]" spanned three days, during which HUD "examined projects on an individual unit basis, looking at the status of occupancy, payment, title, and related issues." HUD's review appears to have been both substantive and detailed. Based on the results of that review, HUD adjusted Crow Housing's overpayment balance. Significantly, instead of imposing § 4161 sanctions (such as terminating payments, reducing payments by the amounts not properly expended, or limiting availability of payments to programs), HUD requested as a means of repayment "adjust[ment of] the amount of a grant" based on "the findings" from the review. *See* 25 U.S.C. § 4165(d). On this record, we have no trouble concluding that HUD triggered § 4165 when it conducted the on-site review of Crow Housing in August 2004.[7]

Our conclusion is entirely consistent with the decision of the Court of Federal Claims in *Lummi Tribe v. United States*, 106 Fed. Cl. 623 (2012). *Lummi* involved a strikingly similar factual pattern: after the 2001 OIG audit, HUD notified three tribes that it had overpaid them due to inaccurate FCAS counts. *Id.* at 624–25. Without conducting hearings, it sought to recover the overpayments by deducting them from future grant allocations. *Id.* at 625. After the tribes filed suit,

---

[7] The district court reasoned that HUD acted pursuant to § 4165 because HUD discovered Crow Housing's FCAS inaccuracies as a result of the 2001 OIG audit. Although we agree that the OIG audit and HUD's actions in this case were temporally correlated, it is not clear from the record that the actions here were a direct result of the 2001 audit. First, the goal of the review conducted by OIG "was not to audit the tribes but to assess NAHASDA program performance as a whole." Second, the OIG report expressly stated that it reviewed no entities in Montana, where Crow Housing is located.

HUD moved to dismiss, claiming it was not required to offer a hearing before attempting to recapture the funds. *Id.* The Court of Federal Claims concluded that when "HUD acted pursuant to an audit conducted at the direction of HUD's Office of Inspector General," its action fell within § 4165. *Id.* at 630. Specifically, the court suggested that HUD's actions constituted a review of "whether the recipient has carried out eligible activities . . . in accordance with this chapter and other applicable law." *Id.* And because § 4165's implementing regulations included an express hearing requirement, *see* 24 C.F.R. § 1000.532 (2012), the court denied HUD's motion to dismiss. *Id.* at 634.

As it does here, HUD claimed in *Lummi* that it acted through its inherent, common law authority to recover payments made by mistake. *Id.* at 629. The Court of Federal Claims rejected that argument, as do we:

> Because we conclude that Section [4165] applies in the instant case, we further conclude that HUD was not free to disregard the requirements of that section in favor of a common law remedy with no apparent rules or limitations. Resort to federal common law is appropriate only when a statute does not speak to the issue. But where, as here, Congress has spoken to the question, HUD may not circumvent that statutory scheme.

*Id.* at 631–32 (footnote and citations omitted).

In support of its common law claim in this appeal, HUD points to *Fort Belknap Housing Department v. Office of Public and Indian Housing*, 726 F.3d 1099 (9th Cir. 2013).

*Fort Belknap* also involved a situation where HUD discovered it had overpaid a tribe based on inaccurate FCAS data, addressed the issue in several letters, and received no response from the recipient tribe for an extended period. *Id.* at 1101–03. When the tribe did respond, HUD decided to recover overpayments through deductions from future allocations and, in its final agency action, denied the tribe's request for an administrative appeal and reconsideration. *Id.* at 1102–04. Unlike Crow Housing, the *Fort Belknap* tribe appealed directly to this court, invoking NAHASDA's special jurisdiction provision under § 4161(d).[8]  *Id.* at 1104.

The narrow issue resolved in *Fort Belknap* was whether our court had jurisdiction to consider the tribe's direct appeal. Our court reasoned that HUD acts under § 4161(a) only when it "finds 'after reasonable notice and opportunity for hearing that a recipient of assistance . . . *has failed to comply substantially*' with some provision of NAHASDA." *Id.* (emphasis added) (quoting 25 U.S.C. § 4161(a)(1)). Notably, in *Fort Belknap* HUD did not attempt to impose any of the remedies or sanctions allowed under § 4161; it only sought to recover overpayments through an administrative offset. *Id.* at 1104–06. Because HUD asserted it had overpaid the tribe due to inaccurate FCAS counts and never made a finding of "substantial noncompliance," we concluded that it did not act pursuant to § 4161(a) when it sought to recover overpayments, and held that our court lacked jurisdiction to hear Fort Belknap's appeal. *Id.*

---

[8] Subsection 4161(d)(1) provides that a recipient tribe may directly appeal to a circuit court of appeals when it receives notice of agency action under § 4161(a).

Here, HUD persuasively argues that it did not act under § 4161 because it never suggested that Crow Housing was in substantial noncompliance, but we do not agree that *Fort Belknap* precludes the possibility that HUD's actions triggered § 4165, as it argues on appeal. *Fort Belknap*'s limited holding only addressed the source of this court's jurisdiction. It has no bearing on whether HUD's actions triggered § 4165 in this instance.[9]

### III.     HUD Did Not Violate A Hearing Requirement Under § 4165.

Having determined that HUD's actions triggered § 4165 in this instance, we turn to whether it violated either of § 4165's two hearing requirements. Subsection 4165(d) provides for a hearing "[s]ubject to section 4161(a)." For the reasons discussed above, we conclude this hearing requirement was not triggered because HUD did not act "[s]ubject to section 4161(a)." We agree with the Court of Federal Claims that § 4165(d)'s introductory phrase "indicat[es] that compliance issues must be addressed under Section 401 and not under Section 405" and "excludes the

---

[9] *Fort Belknap* suggested that HUD acted under common law authority. *Id.* at 1105. HUD relies on that dicta in this appeal, but HUD does not explain why a hearing would not be required under common law. Because we conclude that HUD's audit triggered § 4165, we do not reach the question whether HUD could have acted pursuant to the common law, but we again note *Lummi*'s persuasive rejection of that theory. *See* 106 Fed. Cl. at 631–32.

scope of Section 401 from Section 405."[10]  *Lummi*, 106 Fed. Cl. at 632.

The second hearing requirement lies in § 4165's enabling regulation: 24 C.F.R. § 1000.532(b) (2012).  *See id.* at 633 (observing that § 4165's hearing requirement is in 24 C.F.R. § 1000.532 (2012)).  Section 1000.532 (2012) was in effect at the time of HUD's actions in this case, and it was titled "What are the adjustments HUD makes to a recipient's future year's grant amount under section 405 of NAHASDA?"  That regulation provided:

> (a) HUD may, subject to the procedures in paragraph (b) below, make appropriate adjustments in the amount of the annual grants under NAHASDA in accordance with the findings of HUD pursuant to reviews and audits under section 405 of NAHASDA. HUD may adjust, reduce, or withdraw grant amounts, or take other action as appropriate in accordance with reviews and audits, except that grant amounts already expended on affordable housing activities may not be recaptured or deducted from future assistance provided on behalf of an Indian tribe.[11]

---

[10] Section 405 of NAHASDA refers to 25 U.S.C. § 4165; Section 401 refers to 25 U.S.C. § 4161.  *See* Native American Housing Assistance and Self-Determination Act of 1996, Pub. L. No. 104-330, 110 Stat. 4016.

[11] Crow Housing does not argue that it has already expended grant funds.

(b) Before undertaking any action in accordance with paragraphs (a) and (c) of this section, HUD will notify the recipient in writing of the actions it intends to take and provide the recipient an opportunity for an informal meeting to resolve the deficiency. In the event the deficiency is not resolved, HUD may take any of the actions available under paragraphs (a) and (c) of this section. *However, the recipient may request, within 30 days of notice of the action, a hearing in accordance with § 1000.540.* The amount in question shall not be reallocated under the provisions of § 1000.536, until 15 days after the hearing has been held and HUD has rendered a final decision.

(c) Absent circumstances beyond the recipient's control, when a recipient is not complying significantly with a major activity of its [Indian Housing Plan], HUD shall make appropriate adjustment, reduction, or withdrawal of some or all of the recipient's subsequent year grant in accordance with this section.

(Emphasis added).

Subsection 1000.532(b) (2012) plainly provided for a hearing only if the tribe "request[s one], within 30 days of notice of the action." HUD argues that even if it did act under § 4165 and § 1000.532(b) (2012), it did not violate any hearing requirements because Crow Housing did not request a hearing. We agree. Crow Housing's briefing points to no

such request, it was unable to identify any request at oral argument, and we could find none in the record. Because Crow Housing did not request a hearing, we cannot say that HUD violated its statutory obligation under § 4165, and we hold that HUD did not improperly deprive Crow Housing of a hearing under the facts of this case.

## CONCLUSION

The district court erred by ruling that HUD violated Crow Housing's right to NAHASDA's notice and hearing requirements under § 4161 and § 4165. We therefore VACATE the district court's order remanding the case to HUD for a hearing, REVERSE the district court's judgment, and REMAND for judgment to be entered in favor of HUD.

**VACATED, REVERSED, AND REMANDED.**