ORDER MORITZ, Circuit Judge. These matters are before the court on the Petition for Rehearing or. Rehearing En Bane filed by Appellees in, numbers 14-1407 and 15-1060 and the Petition for Rehearing En Banc filed by Appellees in numbers 14-1313, 14-1331, 14-1338, 14-1340, and 14-1484. Upon consideration and in light of the parties’ post-opinion factual stipulation that HUD has already repaid the Tribes, the panel grants in part the request for panel rehearing in numbers 14-1407.and 15-1060, but only to the, extent of the modifications contained in the attached revised Opinion. Judge Matheson would grant panel rehearing in full on the sovereign immunity issue in numbers 14-1407 and 15-1060. The Opinion and separate writings filed on July 25, 2017, are hereby withdrawn, and shall be replaced by the attache4 revised Opinion and separate writings. The Clerk is directed to file the revised Opinion and separate writings effective, the date of this order. The revised Opinion and separate writings, the Petition for Rehearing or Rehearing En Banc filed by Appellees in numbers 14-1407 and 15-1060, and the Petition for Rehearing En Banc filed by Appellees.in numbers 14-1313,14-1331,14-1338, 14-1340, and 14-1484 were circulated to all of the judges of the court, who are in regular active service. As no member, of the panel and no judge in regular active service on the. court requested that the court be polled, the requests for en banc rehearing are denied pursuant to Fed. R. App. P. 35.' These consolidated appeals arise from a government agency’s decision to recapture, via administrative offset, funds that the agency allegedly overpaid to multiple grant recipients. The grant: recipients brought suit in federal court, -arguing in relevant part" that the agency lacked authority to recapture the funds without first providing them with administrative hearings. The district court agreed and ordered the agency to repay the grant recipients. The agency now appeals that order.[1] If these underlying facts sound relatively straightforward, it’s because they are.' But they, nevertheless give rise tó three legal questions that are decidedly less so: (1) did the agency recapture, the funds pursuant to a statute or regulation that imposed a hearing requirement, thus rendering the recaptures illegal; (2) if the agency didn’t recapture the funds pursuant to such a statute or regulation, did it have authority to recapture the alleged overpayments at all; and (3) if not, could the district court order the agency to reimburse the grant recipients for the amounts it illegally collected? In answering .the first of these three questions, the panel unanimously agrees that the agency didn’t recapture the funds pursuant to a statute or regulation that imposes a hearing requirement. Thus, we agree that the district court erred in ruling that the recipients were entitled to hearings before the agency could recapture the alleged overpayments. But that’s where our unanimous agreement ends; the remaining questions divide the panel. Ultimately, two members of the panel agree that the agency lacked authority to recapture the funds via administrative offset. Accordingly, we affirm the portion of the district court’s order that characterizes the recaptures as illegal. Nevertheless, two other members of the panel agree that under the doctrine of sovereign immunity, the district court lacked authority to order the agency to repay the recipients to the extent the agency had already redistributed or otherwise expended the recaptured funds. Thus, we reverse that portion of the district court’s order and remand for further factual findings. I Congress enacted the Native American Housing Assistance and Self-Determination Act (NAHASDA) of 1996, 25 U.S.C. §§ 4101-4243, to help Indian tribes provide affordable housing for their members, see 25 U.S.C. § 4101(5). To that end, the United States Department of Housing and Urban Development (HUD) allocates NA-HASDA grant funds among recipient tribes each year. In determining how to allocate those funds, HUD employs a regulatory formula that takes into account each tribe’s Formula Current Assisted Stock (FCAS)—a figure calculated by multiplying the number of eligible low-rent housing units in that tribe’s possession by a fixed dollar amount. See 25 U.S.C. § 4152(a)(1); 24 C.F.R. §§ 1000.310(a), 1000.316. Critically, HUD relies on each tribe to provide an accurate yearly count of its eligible housing units. See 24 C.F.R. §§ 1000.315(a), 1000.319(a). And because HUD allocates funds to all tribes from a finite yearly pool, see 25 U.S.C. § 4151, a tribe that erroneously reports an inflated number of eligible housing units will not only receive an overpayment, but will necessarily reduce the funds available to other eligible tribes. See Fort Belknap Hous. Dep’t v. Office of Pub. & Indian Hous., 726 F.3d 1099, 1100 n.2 (9th Cir. 2013) (“Because the total amount of money available to all tribes is fixed, [NAHASDA funding] is a zero-sum game: Any change in one tribe’s allocation requires an offsetting change to other tribes’ allocations.”). Appellees are various tribes (the Tribes) that allegedly inflated their eligible-unit counts—and therefore allegedly received overpayments—during various years.[2] When HUD discovered these alleged over-payments, it recouped the funds by deducting them from the Tribes’ subsequent yearly NAHASDA allocations. The Tribes then sued for the return of those funds. In relevant part, the Tribes argued that HUD lacked authority to recapture the funds without first providing the Tribes with administrative hearings. The district court agreed. As a result, the court ordered HUD to restore the recaptured funds to the Tribes.[3] HUD now appeals. II Because these appeals arise under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, “[w]e take ‘an independent review of [HUD’s] action’ and are not bound by the district court’s factual findings or legal conclusions.” Utah Envtl. Cong. v. Bosworth, 439 F.3d 1184, 1188 (10th Cir. 2006) (quoting Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1569 n.16 (10th Cir. 1994)). We will “ ‘set aside agency action if it is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.”’” Id. (quoting 5 U.S.C. § 706(2)(A)). On appeal, HUD advances three challenges to the district court’s ruling that HUD acted illegally by recapturing the funds without conducting administrative hearings. First, HUD asserts that it wasn’t required to hold hearings before it recaptured the funds because the only statutes and regulations that might require hearings don’t apply here. Second, HUD insists that in the absence of an applicable statute or regulation, it was instead empowered to recapture the alleged overpayments via administrative offset under the common-law doctrine of payment by mistake. Third, HUD states that even if it lacked common-law authority to recapture the alleged overpayments via administrative offset, the district court nevertheless erred in ordering HUD to return the alleged overpay-ments to the Tribes because—with one exception—such an order amounts to an award of “money damages” and therefore runs afoul of 5 U.S.C. § 702.[4] A In concluding that the Tribes were entitled to hearings before HUD could recapture the alleged overpayments, the district court relied on the relevant versions of 24 C.F.R. § 1000.532 and 25 U.S.C. § 4161(a)(1). HUD doesn’t dispute that these provisions required it to provide administrative hearings under certain circumstances. Instead, HUD argues that those circumstances simply aren’t present here. For the reasons discussed below, we agree. And because these provisions therefore don’t apply to HUD’s recapture of the alleged overpayments, neither do their hearing requirements. i Under 24 C.F.R. § 1000.532 (1998), HUD had authority to “make appropriate adjustments in the amount of the annual grants under NAHASDA in accordance with ... findings” that HUD made “pursuant to reviews and audits under [25 U.S.C. § 4165].” 24 C.F.R. § 1000.532(a) (1998). But before doing so, HUD had to first provide “a hearing in accordance with [24 C.F.R.]' § 1000.540 ”[5] 24 C.F.R; § 1000.532(b) (1998). Thus, the threshold question before us is whether HUD recaptured the alleged overpayments based on findings it made “pursuant to reviews and audits under [§ 4165]”; if so, then the Tribes were entitled to “a hearing in accordance with [24 C.F.R.] § 1000.540.” 24 C.F.R. § 1000.532(a), (b) (1998). The relevant versions of §■ 4165 required HUD to undertake “such reviews and audits as may be necessary or appropriate” to make three specific determinations: (1) whether each tribe “carried out its eligible activities in a timely manner, ... carried out its eligible activities and certifications in accordance with the requirements and the primary objectives of this chapter and with other applicable laws, and has a continuing capacity to carry out those activities in a timely manner”; (2) whether each tribe “complied with [its] Indian housing plan”; and (3) whether each tribe’s “performance reports ... [were] accurate.” § 4165(a) (1998); see § 4165(b) (2006). Both the Ninth Circuit and the Court of Federal Claims have held that when HUD reviews a tribe’s report of its eligible housing stock, that review falls within the scope of the first of these three categories, i.e., within HUD’s authority to review a tribe’s activities and certifications. See Crow Tribal Hous. Auth. v. Dep’t of Hous. & Urban Dev., 781 F.3d 1095, 1103 (9th Cir. 2015) (“[W]e conclude HUD’s ... FCAS review constituted .an audit within the meaning of § 4165 to determine whether the Tribe had carried out ‘eligible activities and certification in accordance with this chapter and other applicable law.’ ” (quoting § 4165(b)(l)(A)(i)(II))); Lummi Tribe of Lummi Reservation v. United States, 106 Fed.Cl. 623, 630 (2012) (“Such a review, we believe, comes within [§ 4165’s] broad mandate, .to ensure that the grant program is being conducted in accordance with NA-HASDA.” (citing § 4165(b)(l)(A)(i)(II))>. But as HUD points out, Crow doesn’t acknowledge that “eligible activities” and “certifications” are defined terms—let alone discuss whether, as defined, those terms encompass a tribe’s report of its eligible housing stock. Instead, in concluding that HUD’s. review of a tribe’s reported eligible housing units constitutes a review or audit for purposes of .§ 4165, Crow explicitly states that (1) “NAHASDA does not define ‘eligible activities and certification,’” and (2) “it is ambiguous whether the term encompasses” such reviews. 781 F.3d at 1103 (quoting § 4165(b)(l)(A)(i)(II)). Crow then resolves this alleged ambiguity by applying the Indian , canon, which states that “[statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.” Id. (alteration in original) (quoting Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation, 502 U.S. 251, 269, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992)). Likewise, L/ummi concludes that HUD’s review of a tribe’s eligible housing units falls within HUD’s authority to determine whether that tribe has carried out eligible activities without ever addressing what those eligible activities might be. See 106 Fed.Cl. at 630. We decline to take this approach. Instead, we agree with HUD that the applicable. statutes unambiguously establish that the terms “eligible activities” and “certifications” don’t encompass a tribe’s report oh its eligible housing units. See 25 U.S.C. § 4132 (1998) (explaining that eligible housing activities include housing assistance, development, housing services, housing management services, crime prevention, safety activities, and model activities); id. § 4112(c)(5) (listing certifications); id. § 4114(b)(1) (requiring certification regarding labor standards); id. § 4115(c)- (requiring environmental certification). We see nothing in these statutes pertaining to a tribe’s report of its eligible housing units. And because these statutes therefore unambiguously resolve this issue, we see no need to apply the Indian canon. Accordingly, we part ways’ with both the Ninth Circuit and the Court of Federal Claims to the extent those courts have held that when HUD reviews a tribe’s report of its eligible housing stock, that review falls within the scope of HUD’s authority to review or audit a tribe’s activities and certifications. See ■ § 4165(a)(1) (1998); § 4165(b)(l)(A)(i)(II) (2006). For similar reasons, we rejeet the Court of Federal Claims’ conclusion that HUD’s review of a tribe’s report on its eligible housing units falls within the second and third categories of HUD’s § 4165 authority, i.e., within HUD’s authority to review or audit a tribe’s Indian housing plan or its performance reports. See § 4165(a)(2), (3) (1998); § 4165(b)(1)(A)(iii), (B) (2006); see also Lummi, 106 Fed.Cl. at 630 (reading § 4165 “as conferring broad authority on the Secretary to review a grant recipient’s performance under NAHASDA, including monitoring a grant recipient’s compliance with its Indian housing plan and verifying the áccuracy of the recipient’s performance reports”). Again, nothing in the relevant statutes suggests that either a tribe’s Indian housing plan or its performance'reports must (or even may) include information about the number of eligible housing’units in that tribe’s possession. See § 4112 (1998). (discussing Indian housing plans); 25 U.S.C. § 4164 (1998) (discussing performance reports). Instead, “[t]he Formula Response Form is the only mechanism that a recipient shall use to report changes to the number of FCAS.” 24 C.F.R. § 1000.315(b). In short, reviewing,a tribe’s-report on its eligible housing units doesn’t fall within any of § 4165’s three defined categories of audit-and-review authority. Accordingly, HUD didn’t recapture the alleged overpayments at issue here based on findings HUD made “pursuant to reviews and audits under [§ 4165].”[6] 24 C.F.R. § 1000.532(a) (1998). And that means HUD was under no obligation to afford any of the Tribes “a hearing- in accordance with [24 C.F.R.] § 1000.540” under 24 C.F.R. § 1000.532(b) (1998). ii Alternatively, the Tribes argue that even if they weren’t entitled to hearings under 24 C.F.R. § 1000.532(b) (1998), they were nevertheless entitled to hearings under § 4161 (1998). For two reasons, we again disagree. a In relevant part, § 4161 (1998) provides, [I]f the Secretary finds after reasonable notice and opportunity for hearing that a recipient of assistance under this chapter has failed to comply substantially with any provision of this chapter, the Secretary shall— (1) terminate payments under this chapter to the recipient; (2) reduce payments under this chapter to the recipient by an amount equal to the amount of such payments that were not expended in accordance with this chapter; (3) limit the availability of payments under this chapter to programs, projects, or activities not affected by such failure to comply; or (4) in the case of noncompliance described in section 4162(b) of this title, provide a replacement tribally designated housing entity for the recipient, under section 4162 of this title. § 4161(a) (1998). According to the Tribes, § 4161(a) (1998)’s hearing requirement applies here because HUD “reduce[d]” the Tribes’ NA-HASDA payments under § 4161(a)(2) (1998). But § 4161(a)(2) (1998) only applies when HUD “reduce[s] payments” to a tribe “by an amount equal to the amount of such payments that were not expended in accordance with” NAHASDA. § 4161(a)(2) (1998) (emphasis added). And as HUD notes, it has never suggested or alleged that the Tribes “expended” the alleged overpayments in such a manner. Id. Instead, HUD alleged only that the Tribes’ wrongly received the alleged over-payments. Relying on City of Boston v. Department of Housing and Urban Development, 898 F.2d 828 (1st Cir. 1990), the Tribes characterize HUD’s emphasis on § 4161(a)(2) (1998)’s use of the term “expended” as “hyper-technical,” Aplee. Br. 31 (quoting Boston, 898 F.2d at 832). In Boston, the statute at issue required HUD to provide a hearing before it “terminate[d] ... payments” to the grant recipient. 898 F.2d at 831. And HUD argued that because the grant recipient hadn’t yet “received any funds ... there was no ‘termination’ of ‘payments.’” Id. The First Circuit rejected this “hyper-technical” interpretation of the statute. Id. at 832. But in doing so, it relied on other language in the statute at issue—language that suggested Congress was concerned with “withhold[ing] relevant funding whenever a recipient ... failed to comply with the controlling law,” regardless of “[wjhether the promised payments ha[d] or ha[d] not begun.” Id. Here, the Tribes point to no similar language that suggests Congress, in drafting § 4161, was concerned with money that the Tribes wrongfully received, as opposed to money they wrongfully expended. Accordingly, the Tribes’ reliance on Boston is misplaced. So too is their reliance on Kansas City v. Department of Housing and Urban Development, 861 F.2d 739 (D.C. Cir. 1988). The Tribes assert that, in Kansas City, the court treated as applicable a statute that allowed HUD to “reduce [grant] payments to the recipient ... by an amount equal to the amount of such payments which were not expended” properly, 861 F.2d at 740 (emphasis added) (quoting 42 U.S.C. § 5311 (1982))—even though “[t]here was no allegation of unlawful expenditure^,” Aplee. Br. 31. But it doesn’t appear that either the parties or the court in Kansas City addressed any possible distinction between expending funds and receiving them. In fact, the Tribes acknowledge as much in arguing that Kansas City “implicitly” resolves this issue. Aplee. Br. 30. “Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.” Webster v. Fall, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925). Thus, we decline to rely on Kansas City’s “implicit ]” answer to the question of § 4161’s applicability. Aplee. Br. 30. Instead, we adopt the Ninth Circuit’s explicit answer to this precise question. When HUD alleges only that a tribe incorrectly received funding—but makes “no determination on whether any NA-HASDA funds [were] improperly expended”—HUD doesn’t “act under § 4161, and, accordingly,” isn’t subject to § 4161’s hearing requirement. Crow Tribal Hous. Auth., 781 F.3d at 1102 & n.5 (emphasis added); cf. Fort Belknap Hous. Dep’t, 726 F.3d at 1106 (holding that § 4161 wasn’t implicated where HUD alleged only that tribe wrongly received funding for ineligible housing units, not that tribe expended those funds in manner that wasn’t “in accordance with” NAHASDA (quoting § 4161(a)(1)(B))). And because HUD has never challenged the Tribes expenditures of the alleged overpayments, we agree with HUD that the Tribes weren’t entitled to hearings under § 4161 (1998). b Alternatively, even if we agreed with the Tribes that there exists no meaningful distinction between receiving funds and expending them, we would nevertheless conclude that § 4161 (1998) doesn’t apply to HUD’s recapture of the alleged overpayments. In relevant part, § 4161 (1998) provides, “[I]f the Secretary finds after reasonable notice and opportunity for hearing that a recipient of assistance under this chapter has failed to comply substantially with any provision of this chapter, the Secretary shall,” e.g., “reduce payments ... to the recipient.” § 4161(a)(2) (1998) (emphasis added). According to HUD, it has never suggested that the Tribes’ alleged inflation of their eligible housing units constitutes substantial noncompliance. Thus, HUD concludes, § 4161 doesn’t apply. Cf. Fort Belknap Hous. Dep’t, 726 F.3d at 1104 (holding that applicable version of § 4161 didn’t apply where “HUD neither alleged nor found” substantial noncompliance). To support this argument, HUD points out that Congress amended § 4161 in 2008 to clarify that a recipient’s failure “to comply with the requirements ... regarding the reporting of low-income dwelling units shall not, in itself, be considered to be substantial noncompliance.” Pub. L. No. 110-411, § 4161(2), 122 Stat 4319. HUD asserts that this amendment amounts to a clarification rather than a substantive change. Thus, HUD concludes, the amendment applies retrospectively to HUD’s pre-2008 recaptures of the alleged over-payments. See Dobbs v. Anthem Blue Cross & Blue Shield (Dobbs II), 600 F.3d 1275, 1282 (10th Cir. 2010) (“[A] true clarification applies retrospectively.”). In determining whether the 2008 amendment applies retrospectively, we begin by asking whether “Congress has expressly prescribed the proper reach” of that amendment. Id. To that end, HUD points out that a Senate Report subtitle explicitly refers to the 2008 amendment as a “[cjlarification.” S. Rep. No. 110-238, at 10 (2007). By “us[ing] ... the term ‘clarification’’” in the 2008 amendment’s legislative history, Congress unambiguously expressed “an intent that the amendment apply retrospectively.” Dobbs II, 600 F.3d at 1282; see Dobbs v. Anthem Blue Cross & Blue Shield (Dobbs I), 475 F.3d 1176, 1178 (10th Cir. 2007) (remanding to district court to apply amended statutory language where “amendment’s legislative history suggested] that Congress expanded [relevant] definition to clarify ... legal ambiguity”); cf. Andrus v. Allard, 444 U.S. 51, 59 n.10, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (accepting Senate Report’s indication that amendment constituted “a clarification rather than a substantive change in the reach of the law”); Danielson v. Flores (In re Flores), 735 F.3d 855, 860-61 (9th Cir. 2013) (relying on' title of House Report to interpret ambiguous statute). In fact, as HUD points out, the Ninth Circuit has already relied on the language of this same Senate Report to conclude that (1) “the 2008 amendment was a clarification, not a substantive change to” § 4161, and (2) the amendment therefore applies retrospectively. Crow, 781 F.3d at 1101. We agree with the Ninth Circuit on this point, and we conclude that the Tribes’ failure to accurately report their eligible housing units, standing alone, doesn’t constitute substantial noncompliance. See § 4161(a)(2) (2009) (“The failure of a recipient to comply with the requirements of [25 U.S.C. § 4152(b)(1)] regarding the reporting of low-income dwelling units shall not, in itself, be considered to be substantial noncompliance for purposes of this subchapter.”). Because we see no indication that HUD ever suspected or alleged substantial noncompliance on the part of the Tribes, we conclude that HUD didn’t act pursuant to § 4161 (1998)—and therefore wasn’t subject to § 4161 (1998)’s hearing requirement—when it recouped the alleged over-payments. See Crow, 781 F.3d at 1101-02 (holding that HUD didn’t “act under § 4161, and, accordingly, could not have violated a hearing requirement under that section,” when HUD never alleged substantial noncompliance). B For the reasons discussed above, we agree with HUD that it didn’t act under § 4161 (1998) or 24 C.F.R. § 1000.532 (1998) when" it recaptured the funds. But this conclusion is a double-edged sword. True, it resolves one question in HUD’s favor: it means the district court erred in ruling that HUD was required to provide hearings before recouping the funds. But it raises a second, more fundamental question: in the absence of an applicable statute or regulation, what gave HUD the authority to recoup the funds at all? See Killip v. Office of Pers. Mgmt., 991 F.2d 1564, 1569 (Fed. Cir. 1993) (explaining that federal agencies are “creature[s] of statute”); see also Michigan v. EPA, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (“[I]f there is no statute conferring authority, a federal agency has none.”). In attempting to answer that question, HUD asserts that rather than proceeding under a statute, it recaptured the funds by using “its longstanding, common-law authority to recover- payments made by mistake.” Aplt. Br. 27. As support for this argument, HUD cites six cases.[7] None of them apply here. Of the six cases that HUD cites, only the Ninth Circuit’s decision in Fort Belk-nap even arguably addresses whether a government agency administering a grant program can rely on this common-law right to unilaterally recover overpayments from a beneficiary. And the Ninth Circuit itself has since characterized this portion of Fort Belknap as dicta. See Crow Tribal Hous. Auth., 781 F.8d at 1105 n. 9. We agree. The question in Fort Belknap wasn’t whether HUD had common-law authority to recoup NAHASDA overpay-ments. Instead, the “narrow issue resolved in Fort Belknap was whether [the Ninth Circuit] had jurisdiction to consider the tribe’s direct appeal.” Id, at 1104. And that question turned solely on whether HUD acted under § 4161(a)—not on whether HUD had authority to act pursuant' to some common-law right. See Fort Belknap, 726 F.3d at 1100. The next three cases that HUD cites are likewise unhelpful. They stand only for the limited proposition that the government has a right, even in the absence of express statutory authority, to sue to collect over-payments. See United States v. Wurts, 303 U.S. 414, 416, 58 S.Ct. 637, 82 L.Ed. 932 (1938) (citing “[government’s long-established right to sue for money wrongfully or erroneously paid from the public treasury”);[8] United States v. Lahey Clinic Hosp., Inc., 399 F.3d 1, 15-16 (1st Cir. 2005) (noting “government’s right to sue” to “recover monies wrongly paid from the Treasury, even absent any express statutory authorization”); LTV Educ. Sys., Inc. v. Bell, 862 F.2d 1168, 1169-70, 1175 (5th Cir. 1989) (citing government’s authority to “recover money it mistakenly, erroneously, or illegally paid” where Department of Education sued based on alleged violation of federal regulation). Because HUD opted instead to unilaterally recoup the overpay-ments, rather'than to sue for their, return, these casés are inapposite. That leaves only United States v. Munsey Trust Co., 332 U.S. 234, 236, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947), and Grand Trunk Western Railway Co. v. United States, 252 U.S. 112, 117, 40 S.Ct. 309, 64 L.Ed. 484 (1920). At first glance, Grand Tnmk appears to support HUD’s assertion that it enjoys common-law authority to recover overpay-ments via administrative offset. There, the Court held that the Postmaster General “was under no obligation to . establish the [alleged overpayment] by suit.” 252 U.S. at 120-21, 40 S.Ct. 309. Instead, “[h]aving satisfied himself’ of the alleged overpayment, “he was at liberty to deduct the amount of the overpayment from the moneys otherwise payable to the company to which the overpayment had been made.” Id. But in Grand Trunk, the government didn’t mistakenly overpay the beneficiary of a grant and then withhold the amount-of the overpayment- from that beneficiary’s future-year grant funds, as HUD did here. Instead, the overpayments in Grand Trunk arose in the context of a contractual relationship between the government and the plaintiff: the government entered into a series of “successive -quadrennial contracts” under which “the mails were carried over” a certain stretch of the plaintiffs railroad. Id. at 117, 121, 40 S.Ct. 309. And when the Postmaster General realized that the government had previously overpaid the plaintiff for its use of that stretch of its track, he simpíy “deducted] the amount of the overpayment” from the amount the government owed “under the current contract.” Id. The plaintiff sued, the Court of Claims dismissed, and the Supreme Court affirmed. Id. at 117, 40 S.Ct. 309. Properly limited to its facts, Grand Trunk establishes that when the government enters into a series of contracts with a private party, it can deduct any amount it erroneously overpays that private party “by means of a later debit” to the parties’ “running accounts.” Id. at 121, 40 S.Ct. 309. But this appeal doesn’t arise from a contractual relationship. Instead, it arises from a grant program designed to help the Tribes and their members “improve then-housing conditions and socioeconomic status.” 25 U.S.C. § 4101(5). And Congress explicitly acknowledged in enacting that grant program that “the United States has undertaken a unique trust responsibility to protect and support Indian tribes and Indian people.” § 4101(3). That unique relationship sets this case apart from both Grand Trunk and Munsey Trust, which also arose from a series of contracts. See Munsey Tr., 332 U.S. at 236-39, 67 S.Ct. 1599; Richard B. Cappalli, Federal Grants and Cooperative Agreements: Law, Policy, and Practice § 8:15, at 81 (1991 Cum. Supp.) (explaining that “traditional contract principles are inapro-pos to an understanding of assistance rights and responsibilities” in context of grant funding); cf. Md. Dep’t of Human Res. v. Dep’t of Health & Human Servs., 762 F.2d 406, 409 (4th Cir. 1985) (rejecting argument that court should apply “contractual principles” to federal-grant program, and explaining that grant programs are instead “governed by the applicable statute[s] and implementing regulations”). As these authorities suggest, the rules that traditionally govern contractual relationships don’t necessarily apply in the context of federal grant programs. See, e.g., Cappalli, § 8:15, at 80-81 (distinguishing between contracts and grants; explaining that grantor rights—including right to recapture funds—“must emanate explicitly or implicitly from the grant statutes, regulations duly enacted and consistent with the statute being implemented, or provisions in the grant agreement”; and noting that it’s “unfair to subject the grantee to unannounced and undefined sanctions and remedies” in absence of such provisions). Based on the government’s “unique trust responsibility to protect and support Indian tribes and Indian people,” § 4101(3), we think it would be particularly “unfair,” Cappalli, § 8:15, at 80, to apply common-law contract principles to HUD’s recapture of NAHASDA funds. Thus, neither Grand Trunk nor Munsey Tmst can support the weight of HUD’s common-law-authority argument. Accordingly, we hold that the district court properly rejected HUD’s common-law-authority argument. And because HUD hasn’t advanced on appeal any alternative basis for its authority to recapture the funds via administrative offset,[9] we therefore affirm the district court’s ruling that HUD acted illegally by recapturing the alleged overpayments. C But this victory for the Tribes is largely a hollow one. That’s because HUD enjoys sovereign immunity from claims for money damages. See Utah ex rel. Utah Dep’t of Envtl. Quality v. EPA, 765 F.3d 1257, 1260 (10th Cir. 2014) (explaining that suits against federal agencies are barred by sovereign immunity absent a specific waiver of that immunity); see also 5 U.S.C. § 702 (waiving sovereign immunity for claims against agencies, but only for suits “seeking relief other than money damages” (emphasis added)). And at least some of the district court’s orders directing HUD to repay the Tribes appear to award money damages. The crux of the Tribes’ claims is this: HUD wrongfully decreased their NAHAS-DA funding in various years by subtracting (1) the amount of any alleged overpay-ments the Tribes received in previous years from (2) the amounts to which the Tribes would have otherwise been entitled in subsequent years. For instance, HUD concluded that the Choctaw received over-payments in 1998, 1999, 2000, and 2001. HUD then deducted those alleged over-payments from the NAHASDA funding that the Choctaw otherwise would have received in 2003, 2004, and 2005. Thus, what the Choctaw sought was return of-the 2003,- 2004, and 2005 funding that-HUD wrongfully withheld. But the district court didn’t order HUD to repay the Tribes until many years after HUD recaptured the alleged, overpay-ments, For instance, the court didn’t order HUD to repay the Choctaw until 2014— approximately a decade after HUD withheld the relevant funds. And perhaps because it recognized the distinct possibility that HUD had long since distributed all of the funds from Congress’ 2003, 2004, and 2005 NAHASDA appropriations, the court ordered HUD to repay the Choctaw “from all available sources,” including (1) funds that were “carried[ ] forward from previous fiscal years” and (2) funds that were “appropriated in future grant years.” App. vol. 12, 2463. Citing this aspect of the district court’s order, HUD asserts that the court awarded the Tribes money damages in violation of § 702. We agree.[10] The phrase “money damages” “refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to substitute for a suffered loss, whereas specific remedies ‘are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.’ ” Dep’t of Army v. Blue Fox, Inc., 525 U.S. 255, 262, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999) (quoting Bowen v. Massachusetts, 487 U.S. 879, 895, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988)). Here, the district court awarded the Tribes money damages when it ordered HUD to compensate them using funds from grant years other than the grant years during which HUD wrongfully collected the alleged overpayments. For instance, the “very thing” to which the Choctaw said it was entitled was additional funding from Congress’ 2003, 2004, and 2005 NAHASDA appropriations. Blue Fox, Inc., 525 U.S. at 262, 119 S.Ct. 687 (quoting Bowen, 487 U.S. at 895, 108 S.Ct. 2722). But to the extent that HUD had already distributed the funds from those yearly appropriations to other tribes, HUD couldn’t have possibly returned those funds to the Tribes. Thus, the district court instead ordered HUD to pay the Tribes by “substituting]” other funds for the funds to which the Tribes were actually entitled—i.e., funds from past-or future-year NAHASDA appropriations. Id. (emphasis omitted) (quoting Bowen, 487 U.S. at 895, 108 S.Ct. 2722). This distinction may seem pedantic. After all, money is money. And surely the Tribes don’t care whether HUD repaid them using funds that remained from 2003’s NAHASDA appropriation, or if it instead repaid them from some other source. But “the fungibility [of] money” can easily “obscure[]” the difference between (1) “relief that seeks' to compensate a plaintiff for a harm -by providing a substitute for the loss,” Cty. of Suffolk v. Sebelius, 605 F.3d 135, 141 (2d Cir. 2010) (emphases omitted), and (2) “relief that requires a defendant to transfer a specific res-to the plaintiff,” id. To understand how that distinction operates to preclude relief here, assume for a moment that instead of withholding funds for affordable housing from a particular tribe, HUD instead wrongfully withheld from that tribe an actual house—a house that HUD then gave to another eligible tribe. Because that specific house is no longer in HUD’s possession, the district court can’t order HUD to turn it over to the tribe that should have originally received it. Instead, the best the district court can do is order HUD to give that tribe the house’s monetary equivalent. And that monetary equivalent amounts to substitute relief—i.e., money damages. See Blue Fox, Inc., 525 U.S. at 262, 119 S.Ct. 687; cf. Clymore v. United States, 415 F.3d 1113, 1118, 1120 (10th Cir. 2005) (remanding for findings regarding whether government still had in its possession the “four items seized from [plaintiff] at the time of his arrest”; “to the extent the government [was] no longer in possession of’ plaintiffs property and plaintiff thus instead sought “monetary relief, sovereign immunity bar[red] his claim”). If sovereign immunity would bar the district court from ordering HUD to provide the tribe in this hypothetical scenario with “the cash equivalent” of the wrongfully withheld house, it likewise barred the district court from ordering HUD to provide the Tribes with the “cash equivalent” of the wrongfully withheld overpayments. Diaz v. United States, 517 F.3d 608, 611 (2d Cir. 2008); cf. id. at 612-13 (holding that doctrine of sovereign immunity precluded court from ordering government to pay “monetary equivalent” of seized currency, which could “no longer be identified or located in the coffers of the government”; reasoning that “currency should be treated like any other seized property: if the property is no longer available, sovereign immunity bars the claimant from seeking compensation”). And this rationale—i.e,, the idea that courts should treat money like any other form of property for sovereign-immunity purposes—explains why two of our sister circuits have found the distinction between original funds and substitute funds disposi-tive in cases involving yearly grant appropriations. See Suffolk, 605 F.3d at 141 (explaining that because the “res at issue is identified by reference to the congressional appropriation that authorized the agency’s challenged expenditure,” a claim seeking,, funds from any other source “seek[s] compensation rather than the specific property the plaintiff aims to recover,” and therefore “falls outside the scope of the waiver of sovereign immunity arising from § 702”); see also City of Houston v. Dep’t of Hous. & Urban Dev., 24 F.3d 1421, 1428 (D.C. Cir. 1994) (“An award of monetary relief from any source of funds other than the [relevant fiscal year] appropriation would constitute money damages rather than specific relief, and so' would not be authorized by [§ 702].”)[11]; cf. Am.'s Cmty. Bankers v. FDIC, 200 F.3d 822, 830 (D.C. Cir. 2000) (discussing Houston and reiterating that HUD’s “commitment of the appropriated [grant] funds to other recipients and the expiration of the congressional appropriation” in Houston rendered “an award from other available HUD funds ... money damages as opposed to specific relief’). The Tribes attempt to distinguish the facts in Houston and Suffolk from the facts here. First, they point out that HUD treats NAHASDA funds as interchangeable from year to year, by, e.g., “us[ing] funds appropriated in fiscal years 1998-2008 both to augment underfunding in pri- or' fiscal years and to supplement funds appropriated in subsequent fiscal years.” Aplee. Br. 75-76. The Tribes appear to suggest that by treating NAHASDA funds as interchangeable from year to year, HUD somehow implicitly waived its sovereign immunity against claims for money damages. But “[a] waiver of sovereign immunity ‘cannot be implied’ it “must be unequivocally expressed.” United States v. Mitchell, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (quoting United States v. King, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)). Thus, to the extent that HUD shuffles NAHASDA funding between years, that fact is only relevant if by virtue of such shuffling, funds from the relevant yearly appropriations remained at HUD’s disposal when the district court ordered it to repay the Tribes. If not, then the district court’s order constituted an order to provide “money damages rather than specific relief, and so [it wasn’t] authorized by [§ 702].” Houston, 24 F.3d at 1428. In a related argument, the Tribes note that NAHASDA appropriations are “ ‘no-year’ appropriations.” Aplee. Br. 74. And “[a] no-year appropriation is available for obligation without fiscal year limitation.” 1 U.S. General Accounting Office, Office of the General Counsel, Principles of Federal Appropriations Law, at 5-6 (2d ed. 1991). Thus, the Tribes assert, the “res” at issue here “is the sum of all NAHASDA appropriations, carried forward and backward as they may be.” Aplee. Br. 78 (emphasis added). But the Houston court rejected a very similar argument. There, the district court ruled that “the lapse of the appropriation from which fiscal 1986 [grant] monies were drawn meant that there were no funds available from which HUD could lawfully repay” the plaintiff. 24 F.3d at 1424. The plaintiff challenged this ruling on appeal, arguing that HUD could nevertheless repay it by using “‘no-year’ funds that [were] not reserved for use in any particular year or for particular projects.” Id. at 1428. The D.C. Circuit disagreed, reasoning that those “no-year” funds constituted “[a]n award of monetary relief from a[] source of funds other than the 1986 ... appropriation.” Id. So too here. Thus, to the extent the district court ordered HUD to repay the Tribes “from all available sources,” e.g., App. vol. 12, 2463, we hold that those orders constitute awards of money damages unless HUD had at its disposal sufficient funds from the relevant yearly appropriations. Accordingly, we reverse in part and remand to the district court for factual findings regarding whether, at the time of the district court’s order, HUD had the relevant funds at its disposal.[12] * * * In resolving this appeal, our divided panel unanimously agrees on one thing: the district court erred in ruling that a statute or regulation applies to render HUD’s recapture of the alleged overpay-ments sans hearings illegal. But beyond that, unanimous agreement eludes us. Instead, we form two different majorities in answering the other two questions this appeal presents. Two members of the panel agree that the only potential alternative source of authority HUD identifies on appeal is its common-law right to recover payments made by mistake. And because the same two members of the panel agree that this common-law right doesn’t apply under the circumstances present here, we conclude that HUD lacked authority to recapture the funds. Accordingly, we affirm the district court’s order to the extent that it characterizes the recaptures as illegal. But two other members of this panel agree that even if HUD illegally recaptured the funds, the doctrine of sovereign immunity nevertheless precluded the district court from ordering HUD to repay the Tribes. Thus, with one exception, we reverse the portion of the district court’s order that directs HUD to repay the Tribes and remand for factual findings regarding whether any of the recaptured funds remained in HUD’s possession when the district court ordered it to repay the Tribes. . In resolving the parties’ various arguments, the district court actually entered several separate orders. For simplicity, we treat them as a single order and refer to them as such. . More specifically, the appellees are the Tribes' housing authorities. For purposes of these appeals, we treat each tribe and its housing authority as interchangeable. . Although neither the Tribes nor HUD assert as much in their initial briefs, they both maintain in post-opinion briefing that HUD has already complied with this order by repaying the Tribes. But even in their post-opinion briefing, neither the Tribes nor HUD provide us with any citations to the record that might support this factual assertion. True, the Tribes provide record citations that demonstrate the district court ordered HUD to repay the Tribes. But none of those citations demonstrate that HUD actually complied with the court’s order. See Fed. R. App. P. 28(a)(8)(A) (requiring argument section of appellant's brief to contain "appellant’s contentions and the reasons for them, with citations to the ... parts of the record on which the appellant relies”); Fed. R. App. P. 28(b) (requiring ap-pellee’s brief to "conform to the requirements of” Fed. R. App. P. 28(a)(8)). Nevertheless, despite the parties’ failure to comply with Rule 28’s requirements, we accept their joint factual stipulation on this point. Cf. Creative Consumer Concepts, Inc. v. Kreisler, 563 F.3d 1070, 1078 n.3 (10th Cir. 2009) (noting that "we will honor stipulations to evidentiary facts”). Finally, we note that neither party suggests this procedural fact calls into question HUD’s ability to appeal the district court’s order. On the contrary, HUD asserts in post-petition briefing that it specifically informed the Tribes that it was reserving its right to appeal despite its compliance with the district court's order. And although HUD doesn’t provide a record citation to support this factual assertion, the Tribes have never suggested that HUD’s compliance with the district court’s order implicates its right to appeal. . HUD also argues that it didn’t act arbitrarily and capriciously in concluding that the Tribes misreported the number of eligible housing units in their possession. But even assuming HUD is correct on this point, we conclude that HUD nevertheless lacked authority to recapture the alleged overpayments. Accordingly, we need not address this argument. . More specifically, a "recipient [could] request ... a hearing in accordance with § 1000.540” if the dispute was "not resolved” via an "informal meeting.” 24 C.F.R. § 1000.532(b) (1998). Because neither party suggests that the matter of the alleged over-payments was ' "resolved” via an “informal meeting” or that the Tribes didn’t request hearings, id., we don’t address those possibilities. . Because we conclude that neither § 4165 (1998) nor 24 C.F.R. § 1000.532 (1998) applies to HUD’s recapture of the funds, we reject the Tribes’ argument that those provisions operated to bar HUD from recapturing the funds at all—with or without a hearing— unless HUD first demonstrated that the Tribes hadn’t already spent those funds on affordable housing activities. See, e.g., § 4165(c) (1998) (allowing HUD to "adjust, reduce, or withdraw grant amounts, or take other action as appropriate in accordance with the reviews and audits ... under this section, except that grant amounts. already expended oh affordable housing activities may not be recaptured or deducted from future assistance provided on behalf of an Indian tribe,”); 24 C.F.R. § 1000.532(a) (1998) (same). . HUD cites additional cases in its reply brief, But like the cases that HUD cites in its opening brief, these additional cases simply don’t address or implicate the specific factual scenario we face here. . Judge Bacharach asserts that "five federal appellate courts have interpreted Wurts to allow offset without the need for suit.” Op. of Bacharach, X, 4 & n.2. But none of the cases he cites address whether the federal government enjoys common-law authority to recoup funds via administrative offset in the context of a grant program. And'for reasons we discuss below, that distinction makes a difference, . Judge Bacharach suggests that if HUD. doesn’t enjoy common-law authority to recoup the overpayments by administrative offset, this leaves "a gap in NAHASDA” that HUD necessarily enjoys implicit "authority to fill.” Op. of Bacharach, J., 8-9. But HUD has never advanced such an implicit-authority argument—either below or on appeal. Thus, it has waived reliance on any implied-authority theory as a basis for reversal. See Bronson v. Swensen, 500 F.3d 1099, 1104-05 (10th Cir. 2007) (finding waived and declining to address argument that appellant failed to “adequately raise and pursue” in opening brief); see also Greenlaw v. United States, 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008) (“[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.” (emphasis added)). In any event, even assuming it would be appropriate for us to sua sponte reach this issue, the cases that Judge Bacharach cites in support of his implicit-authority theory indicate only that HUD enjoys authority to fill gaps in NAHASDA by promulgating rules and regulations. See id. at 9; Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." (emphasis added)); Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) (“The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.” (emphasis added)); Morrow v. Clayton, 326 F.2d 36, 45 (10th Cir. 1963) ("We think the promulgation of the regulation by the Secretary was a lawful exercise of the power and authority vested in him [by statute] to administer the program ...." (emphasis added)). Yet Judge Bachar-ach doesn't identify a rule or regulation that would allow HUD to recoup overpayments by administrative offset. Neither does HUD. Thus, even assuming that "Congress implicitly delegated to HUD the authority to fill [NA-HASDA’s] statutory gap” by promulgating such a regulation, Op. of Bacharach, J., 10, it doesn’t appear that HUD exercised that implicit authority here. Accordingly, even if it were appropriate for us to raise this theory sua sponte, see Greenlaw, 554 U.S. at 243, 128 S.Ct. 2559, it wouldn’t provide a basis for reversal. As a final matter, Judge Bacharach suggests that the Tribes have somehow waived any argument that such rules or regulations don't exist. See Op. of Bacharach, J., 11 ("[T]he [T]ribes have not questioned the sufficiency of HUD's implementing regulations.”); id. at 11 n.5 ("The [T]ribes have argued only that HUD lacked statutory authority, not that HUD failed to properly implement that authority by adopting regulations.”). But as the appellant, HUD must identify a valid basis for reversing the district court’s rulings. See Nixon v. City & Cty. of Denver, 784 F.3d 1364, 1366 (10th Cir. 2015) ("The first task of an appellant is to explain to us why the district court’s decision was wrong,”). As appellees, on the other hand, the Tribes have no obligation to attempt to refute a potential basis for reversal that HUD has never advanced. See Headrick v. Rockwell Int'l Corp., 24 F.3d 1272, 1278 (10th Cir. 1994) ("In preparing briefs and arguments, an appellee is entitled to rely on the content of an appellant’s brief for the scope of the issues appealed .... ” (quoting Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 3 (1st Cir. 1983))). Contrary to Judge Ba-charach’s suggestion, therefore, the Tribes simply cannot waive a response to an argument that HUD doesn’t make. , The district court previously ordered HUD to set aside a portion of the 2008 NAHASDA appropriation for the purpose of repaying the Tribes. To the extent that (1) any of the Tribes allege that HUD wrongfully withheld 2008 NAHASDA grant funds, and (2) the 2008 funds that HUD set 'áside were sufficient to cover those Tribes’ 2008 losses, this sovereign-immunity analysis doesn’t apply. For instance, HUD concedes that the district court’s order directing HUD to repay the Navajo doesn’t constitute an award of money damages. . Judge Matheson asserts that "we should follow Bowen," rather than Houston and Suffolk. Op. of Matheson, J., 11. But the issue we , confront today—i.e., whether an order to pay a grant recipient from a source of funds other than the relevant fiscal year appropriation constitutes an award of money., damages— simply didn't arise in Bowen. On the contrary, it doesn’t appear that the district court in Bowen ordered the federal government to transfer any funds to Massachusetts, let alone that it ordered the government to transfer those funds from a source other than the original one. See Bowen, 487 U.S. at 888, 108 S.Ct. 2722 (noting that "judgment did not purport to state what amount of money, if any, was owed by the United, States to Massachusetts, nor did it order that any payment be made”). Instead, it appears that Massachusetts may have simply remained in possession of the disputed funds all along, thus rendering it unnecessary for the district court to order their retürn—and likewise rendering it unnecessary for the Supreme Court to address whether such an order might constitute an award of money damages. See, e.g., id. at 884 & n.3, 108 S.Ct. 2722 (noting that applicable statute allowed Massachusetts to retain disputed funds "pending resolution of the dispute"). . For the reasons discussed above, see supra n.9, we affirm the district court’s order directing HUD to return to the Navajo the funds it wrongfully recaptured from that tribe in 2008, but only to the extent that sufficient funds were set aside from the 2008 NAHAS-DA appropriation for that purpose.